UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>CARLOS NICHOLAS TORRES,<br>JESSICA MARIE MEKOSCH,<br><br>    Defendants. | Case No. 4:25-cr-00061-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Defendant Jessica Mekosch's Motion to Suppress (Dkt. 78), Defendant Carlos Torres's Motion to Suppress (Dkt. 79), and Mekosch's Joinder to Torres's Motion (Dkt. 98). In her Motion, Mekosch focuses on *Miranda* warnings, and a purportedly invalid waiver of said rights. In his Motion, Torres argues the Government relied on stale and uncorroborated information to obtain "ping warrants," and then exceeded the bounds of the warrants it obtained. Mekosch later joined Torres's Motion regarding the ping warrant. The Government opposes all Motions. Dkt. 104.

The Court held oral argument on December 9, 2025, and took the matters under advisement. Dkt. 117. Upon review, and for the reasons outlined below, the Court

GRANTS in PART and DENIES in PART Mekosch's Motion to Suppress and DENIES Torres's Motion to Suppress and Mekosch's Joinder in the same.

## II. BACKGROUND

In June 2024, an Idaho State Police confidential source ("CS1") informed Detective Mark Hulet that Torres obtained approximately five pounds of methamphetamine per week from a source in Utah. Torres either traveled to Utah himself to pick up the drugs or arranged for others to deliver the drugs to him. In July 2024, CS1—at law enforcement's direction—conducted a controlled purchase of 56.12 grams of methamphetamine from Torres.

On August 5, 2024, Detective Hulet observed Torres conduct a brief hand-to-hand exchange of a small package which, based upon his training and experience, he believed to be consistent with narcotics trafficking.

On August 16, 2024, East Idaho Crime Stoppers received, and then submitted to law enforcement, an anonymous tip that Torres was selling drugs in Idaho Falls, Idaho. The tipster identified Torres's girlfriend, Jessica Mekosch, as assisting him in transporting drugs from Arizona and California to Idaho, explained Torres drove a newer white Kia, and that he and Mekosch lived in the Pine Shadow/Shadow Canyon apartments in Idaho Falls. Surveillance confirmed that Torres drove a 2021 white Kia registered to him and further, that he resided with Mekosch at the Shadow Canyon apartments. Detective Hulet also confirmed Torres's phone number through subscriber information and confirmed AT&T was the service provider.

Based upon the aforementioned information, Detective Hulet sought a warrant for real-time prospective location information ("ping data") on Torres's phone. Dkt. 79-1, at 1–3. Bannock County Magistrate Judge David K. Penrod issued a daytime warrant on October 29, 2024. *Id*. at 4. The warrant was served on AT&T on October 31, 2024, and the Drug Enforcement Administration and Idaho State Police began receiving ping notifications on Torres's phone on November 4, 2024.

Beginning November 13, 2024, ping data placed Torres's phone in Power County, Idaho, and then near Pendleton, Oregon. By November 14–15, Torress appeared to be in the Seattle, Washington area. On November 16, Hulet observed Torres returning from Washington to Pocatello, Idaho, in a white Kia. Mekosch was also observed following Torres in a Chevy Malibu—a configuration consistent with "decoy car" tactics sometimes used by drug traffickers to evade law enforcement.

On December 3, 2024, ping data and physical surveillance showed Torres and Mekosch at a residence in Chubbuck, Idaho. That residence was known to law enforcement as being associated with individuals in the drug community. Between December 4–8, Torres's phone again pinged near Seattle before returning to Idaho on December 9–10. A second confidential source ("CS2") communicated to law enforcement that Torres and his associates traveled to Washington or Oregon to pick up methamphetamine and that Mekosch frequently acted as a decoy driver while travelling. CS2 also reported seeing Torres with several gallon-sized bags of methamphetamine.

On December 20, 2024, Hulet applied for a 60-day extension of the original ping warrant, incorporating the November–December observations in his application. Bannock

County Magistrate Judge Anson L. Call approved the extension on Torres's phone and authorized a similar warrant for prospective location data on Mekosch's phone.

Between December 31, 2024, and January 2, 2025, ping data placed both phones in Las Vegas, Nevada. On January 3, 2025, Torres's phone appeared near Jackpot, Nevada, and Hulet observed the Kia and Malibu returning from Nevada toward Idaho Falls.

On January 8, both phones again pinged in Jackpot, Nevada, then Twin Falls, Idaho, before returning to Pocatello and Idaho Falls. Throughout January, officers intermittently surveilled Torres and his associates, including observing multiple visits to residences associated with drug trafficking.

On January 23, 2025, CS2 attempted to arrange a controlled introduction between Torres and an undercover officer, but Torres did not appear. On January 30, 2025, law enforcement conducted a controlled narcotics purchase from co-defendant Michelle Wallace. Torres and another co-defendant, Justin Crabtree, were observed in the area in the white Kia. Detectives subsequently obtained a search warrant for Torres's vehicle.

Separately, on February 1, 2025, Idaho State Police stopped Mekosch's car pursuant to a warrant. In an initial pre-Miranda exchange, Mekosch admitted having methamphetamine and a firearm in the vehicle. Mekosch was arrested and taken to the police station. There, Mekosch provided a written *Miranda* waiver and was interviewed for approximately 35 minutes. During the interview, Mekosch made multiple statements implicating herself and Torres in drug trafficking. Mekosch was then released.

On February 3, 2025, a third confidential source ("CS3") reported that Torres and Crabtree were flying to Las Vegas to obtain drugs. Ping data confirmed Torres's phone at

the Idaho Falls Airport. Between February 3 and 7, Torres's phone pinged at locations across Nevada and California as well as near St. George, Utah.

On February 7, Hulet began surveilling Torres in northern Utah. Ping data and physical observation showed Torres, Crabtree, and co-defendant Cheri Ritter traveling together in three vehicles, two of which were rentals. The group returned to Pocatello and stopped at Torres's mother's residence. CS3 reported seeing approximately 50 pounds of methamphetamine at Torres's mother's residence that day.

Based on the February travel, the ping data, and CS3's information, officers obtained a warrant to search the Chevrolet Malibu rental car. At approximately 12:51 p.m. on February 7, 2025, Detective Ryan Anthony stopped Torres in Pocatello and arrested him. The Malibu was searched pursuant to the warrant and yielded cash, identification documents, marijuana, approximately 42 grams of cocaine, and roughly 45 pounds of methamphetamine.

Later that day, officers obtained and executed a warrant at Torres's apartment at 1325 Hoopes Avenue, in Idaho Falls, Idaho, where they recovered a handgun, drug paraphernalia, marijuana, cocaine, suspected fentanyl pills, methamphetamine, and Torres's cellphone (later searched under a separate warrant).

On February 25, 2025, a federal grand jury returned a five-count indictment alleging that Torres and Mekosch, along with others, engaged in a methamphetamine trafficking conspiracy and that Torres possessed methamphetamine with the intent to distribute. *See generally* Dkt. 2.

MEMORANDUM DECISION AND ORDER - 5

Mekosch recently moved to suppress her statements to law enforcement alleging her *Miranda* waiver was invalid. Dkt. 78. Torres then moved to suppress the evidence gleaned from the ping warrants on two grounds: first, that the data used to obtain the warrants was stale and uncorroborated, and second, that law enforcement exceeded the scope of the warrant and the subsequent extension. Dkt. 79. Mekosch later joined Torres's Motion as to the ping warrants. Dkt. 98.

### III. LEGAL STANDARD

**A. Seach and Seizure**

The Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Mapp v. Ohio*, 367 U.S. 643, 646 n.4 (1961) (quoting U.S. Const. amend IV). The Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Consequently, the "touchstone" of a court's analysis under the Fourth Amendment "is always 'the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106,108–109 (1977) (quoting *Terry, v. Ohio*, 392 U.S. 1, 19 (1968)). "[T]here is no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." *Terry*, 392 U.S. at 21.

Though "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands," *United States v. Leon*, 468 U.S. 897, 906 (1984), the exclusionary rule is "a judicially created remedy designed to safeguard

MEMORANDUM DECISION AND ORDER - 6

Fourth Amendment rights generally through its deterrent effect," *United States v. Calandra*, 414 U.S. 338, 348 (1974). Under the exclusionary rule, "illegally seized evidence" cannot be used "against the search victim in a criminal trial." *Id*. at 350; *see also Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

### B. Miranda

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the Supreme Court held the Fifth Amendment's prohibition against compelled self-incrimination requires that a criminal defendant must be advised: (1) he has the right to remain silent; (2) anything he says can be used against him in a court of law; (3) he has the right to the presence of an attorney; and (4) if he cannot afford an attorney one will be appointed for him prior to questioning if he so chooses. With respect to the right to an attorney, a criminal defendant must be warned he has the right to consult with counsel both before and during questioning. *People of Territory of Guam v. Snaer*, 758 F.2d 1341, 1342–43 (9th Cir. 1985).

Though the Supreme Court does not require a "verbatim recital of the words of the *Miranda* opinion," the warning must reasonably convey to a suspect his rights as *Miranda* requires. *California v. Prysock*, 453 U.S. 355, 359–60 (1981). When a suspect is subjected to a custodial interrogation without first being advised of his rights, "*Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

## IV. ANALYSIS

### A. Mekosch's Motion To Suppress

In her Motion, Mekosch asked the Court to suppress statements she made: (1) during the initial traffic stop, and (2) later at the police station. At oral argument, the Government agreed not to use any of Mekosch's statements from the traffic stop. Accordingly, those statements are suppressed, will not be allowed at trial, and Mekosch's Motion is Granted to that extent. The Court will focus next on Mekosch's second argument.

Mekosch contends "the government cannot show that [she] knowingly and intelligently waived her *Miranda* rights nor can the government show that any such waiver was voluntary" prior to her interview with Detective Hulet at the police station. Dkt. 78-1, at 5. The Court disagrees.

"For a waiver of rights to be valid it must be voluntarily, knowingly, and intelligently given. Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir.), amended, 416 F.3d 939 (9th Cir. 2005) (citation modified).

In this case, prior to her questioning with Detective Hulet, Mekosch was provided with a written warning explaining her rights under *Miranda*. Dkt. 104, at 3. Detective Hulet also testified—with corroborating audio evidence—that in addition to providing the written document, he verbally advised Mekosch of her rights (by reading the written document). Dkt. 115, at 27; Exhibit 1006. Mekosch then signed the waiver with Detective Hulet as the witness. Dkt. 104, at 3.

Nothing in the record, including briefing and oral argument, indicates Mekosch's waiver was not voluntarily, intelligently, and knowingly given. The best Mekosch can assert is that she was emotionally upset during the interview and that Detective Hulet knew she was involved with drugs. But neither of these facts, standing alone, are sufficient to rebuff Detective Hulet's testimony that he had no reason to think Mekosch did not understand the *Miranda* warnings.[1] Even taking Mekosch's position as true does not negate the waiver. Mekosch could have been emotional *and* a former/current drug user *and still* provide an adequate wavier of her rights. Nothing in the record or testimony undercuts such a conclusion.

Mekosch has not provided any meaningful evidence to support her argument that she did not knowingly, intelligently, and voluntarily waive her rights. The Court, therefore, finds her waiver was valid and any statements made to Detective Hulet after she signed the waiver will not be suppressed.

Mekosch's Motion (Dkt. 78) is GRANTED in PART and DENIED in PART as outlined above.

### B. Torres's Motion to Suppress and Mekosch's Joinder

Torres contends any information gathered from the ping warrant should be suppressed for two reasons. First, he argues the initial ping warrant was based on stale,

---

[1] Mekosch essentially faults Detective Hulet for not asking if she was doing ok. But the flip-side is also true: Mekosch gave no indication that she *was not* ok. Now, in some circumstances a person may not be able to articulate he or she is not doing well (e.g. intoxication). But any reasonable officer would be able to see the person was struggling. In any event, that is not the case here. Detective Hulet did not see any evidence—and Mekosch has pointed to none—suggesting Mekosch did not understand what was happening at the time she waived her rights.

uncorroborated, information and similarly, that the extension of his warrant was based on non-criminal information. Second, Torres asserts the Government exceeded the limits of the warrant by retrieving data during the nighttime because the warrant was a "daytime warrant." The Court will address each argument in turn.

As a threshold matter, however, the Government argues, in its written closing argument, Torres and Mekosch only have standing to contest their own ping warrants, not each other's. Dkt. 116, at 2. Although this issue was not addressed in pre-hearing briefing or at oral argument, the Government is concerned that some of the Defendants' questions at oral argument suggested a belief that any or all defendants in this case—even those not participating in these current motions—could object to the ping warrants for *other* defendants.

The Court confirms the Government's position: each defendant has standing to challenge *only* his or her own ping warrant; there is no special standing for co-conspirators. The Supreme Court has long held that Fourth Amendment challenges are limited to "those whose rights were violated by the search itself, not [to] those who are aggrieved solely by the introduction of damaging evidence" from another party. *Alderman v. United States*, 394 U.S. 165, 172 (1969).

Torres had a reasonable expectation of privacy in his ping location and Mekosch had a reasonable expectation of privacy in her ping location. But neither has an expectation of privacy vis-a-vis the other person's ping location. *Carpenter v. United States*, 585 U.S. 296 (2018) (explaining defendants have an expectation of privacy in historical cell-tower records maintained by a third-party cell phone service provider for their own devices).

MEMORANDUM DECISION AND ORDER - 10

In short, each defendant has standing to challenge his or her own ping warrant and nothing more. Because the arguments are identical, however, the Court will largely address them in tandem, separating specific arguments out as necessary.

1. *The Ping Warrants were not based on stale, uncorroborated information.*

    a. Torres

Torres argues the information provided to the Magistrate Judge to support probable cause for his ping warrant was stale because it was based on a single incident that occurred months prior to when the police sought the ping warrant. Dkt. 79, at 16. Additionally, he argues the three separate instances used by the police to support probable cause do not constitute a pattern sufficient to justify the warrant. *Id*. As for corroboration, Torres argues the information was unreliable because it came from an anonymous tip. Dkt. 79, at 17.

"Information offered to support a search warrant application becomes stale when enough time has elapsed such that there is no longer sufficient basis to believe . . . that the items to be seized are still on the premises." *United States v. Grant*, 682 F.3d 827, 835 (9th Cir. 2012) (citation modified). Said another way, a search warrant is not stale where there is a "sufficient basis to believe, based on a continuing pattern or other good reasons" that the items sought can still be recovered. *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (citation modified). "With respect to drug trafficking, probable cause may continue for several weeks, if not months, of the last reported instance of suspect activity." *Id.*

The facts here indicate the evidence used to obtain the warrant was not stale. Detectives received information from a confidential informant in June of 2024 that Torres was either picking up himself, or receiving from others, roughly five pounds of

MEMORANDUM DECISION AND ORDER - 11

methamphetamine per week. Detectives then performed a controlled buy in July of 2024. Law enforcement also observed a series of short interactions consistent with drug distribution in August of 2024. Finally, police received an anonymous tip in October that Torress was trafficking drugs.

This series of events illustrates the information used to obtain the ping warrant was not stale; rather Detectives were investigating and building their case to ensure they had sufficient evidence to present to a judge. As noted in *Angulo-Lopez*, in drug trafficking cases, probable cause may continue for several weeks or months of the last reported instance of activity because of the very nature of the crime—e.g., it is difficult to show a pattern of conspiracy or trafficking with a single incident. 791 F.2d at 1399.

And while it is true that "an anonymous tip is insufficient to establish probable cause" for a warrant, it is only insufficient "absent independent corroboration through police investigation or some other indication of reliability." *United States v. Clark*, 31 F.3d 831, 835 (9th Cir. 1994). *See also United States v. Artis*, 919 F.3d 1123, 1134-35 (9th Cir. 2019) (explaining probable cause may properly be based on unidentified informant's tip if it has been corroborated by law enforcement).

Here, Detective Hulet's actions easily corroborate the anonymous tip. The tip was specific to methamphetamine distribution, and the police had previously purchased methamphetamine from Torres. Also, the tip specified that Torres had a girlfriend named Jessica, that they lived in an apartment complex in Idaho Falls, and that Torres drove a newer white Kia. Detective Hulet had watched Torres and knew that his girlfriend was Mekosch, that they lived together, and that Torres drove a white Kia.

MEMORANDUM DECISION AND ORDER - 12

In short, the information used to support Detective Hulet's probable cause affidavit was not stale and the anonymous tip was corroborated by other observations and evidence.

    b. Mekosch

The warrant authorizing the ping on Mekosch's phone did not lack probable cause either. The information outlined above as to Torres also applies to Mekosch because: (1) Detectives knew Mekosch was Torres's girlfriend and they lived together, (2) CS2 told Detectives that Mekosch would move drugs *for* Torres on occasion, and (3) Detectives observed Mekosch *with* Torres (or in an adjacent vehicle) on numerous occasions when Torres was known to be transporting drugs. Dkt. 98-1, at 2–3. This information was relevant, corroborated, and sufficient to support probable cause for the ping warrant on Mekosch's phone.

In short, the Court finds the information used to establish probable cause for *both* warrants was not stale, and the anonymous tip regarding Torres was corroborated by Detective Hulet.

2. *Torres's Ping Warrant Extension and Mekosch's Ping Warrant were based on Criminal Information and Validly Issued.*[2]

Torres next argues the extension of his warrant should not have issued because it was based on non-criminal information. Dkt. 79, at 18. Specifically, Torres argue the facts provided "do not confirm the reliability of the first warrant," and "a trip to Seattle can be innocuous, and common driving is not criminal." *Id.* Additionally, Mekosch argues

---

[2] Again, each defendant only has standing to challenge his or her own warrant, but because the circumstances in this case are so intertwined—especially on this particular point—the Court will discuss the Parties' arguments in tandem.

MEMORANDUM DECISION AND ORDER - 13

initiating the ping warrant on *her* phone based on these events amounts to finding criminal what is otherwise "non-criminal driving patterns . . . ." Dkt. 98, at 3.

To begin, both Defendants severely under-emphasize the evidence against them. As explained above, there was *ample* evidence to support the conclusion that Torres and Mekosch were engaged in drug trafficking—controlled buys, confidential sources, anonymous tips, and other law enforcement observations. While a single instance, standing alone, *may* not have been sufficient to support a probable cause affidavit, when taken in conjunction with each other, all these interactions and observations were more than enough to support Detective Hulet's application and Judge Call's decision to extend the warrant or Torress and initiate a warrant on Mekosch.

Both Defendants argue the behavior Detectives observed—specifically going to Seattle and driving together—was innocent and cannot support the warrants. But the Supreme Court has cautioned against looking at events in isolation or finding that events "readily susceptible to an innocent explanation [are] entitled to no weight." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citation modified). Rather, Courts are to view the "totality of the circumstances" when deciding whether seemingly innocent behavior requires further investigation. *Id*. See also *United States v. Sokolow,* 490 U.S. 1, 9 (1989) (holding that factors which by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion of criminal activity based upon the attending circumstances). Finally, probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of criminal activity." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (citation modified).

Here, the extension of Torres's warrant and the initiation of Mekosch's warrant were based on contemporaneous information from reliable confidential sources suggesting the reason for Torres and Mekosch's trips to Seattle was for the purpose of acquiring drugs. Thus, while travelling to Seattle (even in different vehicles) is not criminal in isolation, when viewed against the totality of the circumstances, it is not difficult for the Court to find the events provided sufficient probable cause to issue the extension of Torres's warrant and add a warrant for Mekosch.

3. *Execution of the Ping Warrant*

Lastly, Defendants argue the ping warrants should be suppressed because both warrants were "daytime" warrants, but Detectives received alerts on each Defendant's cellphone around the clock—meaning during the day *and* night.

Idaho Rule of Criminal Procedure 41 outlines warrants must be "served in the daytime, unless for reasonable cause shown, the judge by appropriate provision in the warrant authorize its execution at times other than daytime. 'Daytime' means the hours between 6:00 a.m. and 10:00 p.m. according to local time." Idaho R. Crim. P. 41(d)(4) ("Rule 41"). Because AT&T provided data to Detectives around the clock, Defendants claim law enforcement impermissibly exceeded the scope of each warrant.

The initial problem with this argument is that Rule 41 does not explicitly define the terms "served" and "execution." For its part, the Government believes a warrant is "executed" when it is "served" upon the target. In other words, so long as it serves (e.g. "delivers" or "executes") the warrant between 6:00 a.m. and 10:00 p.m., they have complied. Defendants, however, appear to believe execution implies performing the task

outlined in the warrant. Thus, while a warrant must be "served" (e.g. "delivered") during the day it must be "executed" during the day as well. Thus, a warrant that is "executed" constantly, as in this case, must comply with the stricter nighttime requirements. The Court finds the definition lies somewhere in the middle.

Subsection (d)(4) of Rule 41 initially uses the word "served" when discussing the service of a warrant but then transitions to "executed" later in the same paragraph. This might suggest the words are interchangeable. But such a conclusion would undercut the distinction between daytime and nighttime warrants and the "reasonable cause" that must be shown for the later. Furthermore, it is the Court's experience that *most* warrants are for discrete tasks, meaning a warrant is authorized to search a particular place or seize a particular item. Thus, service and execution happen roughly around the same time—meaning a law enforcement officer "serves" the warrant on the target and "executes" the task (searching or seizing) at that time. Thus, unless there is good cause shown, that service *and* execution—again because they happen simultaneously—must happen during the day.

Here, the situation is more nuanced. Yes, the warrants here were both titled "Day Time Seach Warrant," Dkt. 79-1, at 4; Dkt. 98-2, at 1, but each authorized "any and all current, real time location information." *Id*. And for a period of "60 days *after execution* of this warrant." *Id*.[3]

Detective Hulet testified the warrants were sent to, and processed by, AT&T during

---

[3] This language supports the Government's interpretation that "execution" is the same as "service." Meaning, if the Court were to accept Defendants' definition that execution is ongoing, there would be no way to define what 60 days *after* execution means—because "execution" would be constantly happening.

the day. Dkt. 115, at 15. But it would seem impractical to limit the retrieval of "any and all" location monitoring data to daytime hours.[4]

Importantly, the Court can consider the affidavit when determining the scope of the warrant. *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978). The circumstances surrounding the issuance of the warrant may also be relevant. *Id*.

First, Detective Hulet's affidavits did not limit his requests to daytime hours. Second, while Hulet did not specifically outline that any of his observations occurred at night, he did not say all occurred during the day either. And while travelling to Utah or Nevada may be an activity that can be completed in a single day during daylight hours, there was evidence Torres and Mekosch were travelling to California, Arizona, and Washington. At the very least, this *suggests* that travel was happening more than simply during the day.

Moreover, Detective Hulet is not a lawyer. While his language could have potentially been more precise, the lack of specifics does not invalidate the warrant. *See Illinois v. Gates*, 462 U.S. 213, 235 (1983) (noting that affidavits and warrants are "normally drafted by nonlawyers in the midst and hast of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area").

The Court does not formally decide the definition of "served" and "executed" as

---

[4] Examples are not necessary, but it is not hard to imagine a scenario where such a rule would be illogical. If criminal activity is afoot or law enforcement officers are in pursuit of a suspect and monitoring his or her location and activities, it would be impractical (and potentially dangerous) to cut off the investigation at an arbitrary hour.

MEMORANDUM DECISION AND ORDER - 17

applied to Rule 41 today. However, it does find the Defendants interpretation impractical and un-supported by the evidence.

Moreover, as applied to *Federal Rule of Criminal Procedure* 41, the Ninth Circuit has held noncompliance requires suppression only where "(1) there was prejudice in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the rule." *United States v. Stefanson*, 648 F.2d 1231, 1235 (9th Cir. 1981) (citation modified). The Court finds this framework helpful as applied to Idaho Rule 41 and the circumstances of this case. There is no indication here that law enforcement *would not* have received the same data and brought the same case had their search been limited to the hours of 6:00 a.m. and 10:00 p.m. Additionally, there is no evidence to suggest the Detectives deliberately went against a provision of the rule. At *most,* the rule is ambiguous.

Finally, even if the Court sought to limit the warrants in this case as Defendants suggest, the Ninth Circuit has found that a search that *began* during the day and extended into the night was permissible because the initial service occurred during the day. *See, e.g., United States v. Woodring*, 444 F.2d 749, 751 (9th Cir.1971). *Accord United States v. Joseph*, 278 F.2d 504, 505 (3d Cir. 1960); *United States v. McCarty*, 475 F.3d. 39, 44 (1st Cir. 2007)). Because these warrants were originally served and executed during the day, it was permissible that they extended into the night.

Here, the ping warrants were sent to the service provider at normal business hours during the day. Second, the affidavits requested—and the warrants authorized—"any and all current, real time location information" for up to 60 days. Limiting the data to daytime

MEMORANDUM DECISION AND ORDER - 18

hours would be impractical. Third, per the suppression standard in the Ninth Circuit, the Court finds the execution of these warrants was not prejudicial and there is no evidence to suggest law enforcement had any intentional or deliberate disregard for Rule 41. Finally, even assuming a limitation, it is not unreasonable for a warrant to be executed in the daytime and then continue into the nighttime similar to *Woodring, Jospeh,* and *McCarty*.

Accordingly, the search warrants were properly executed, any data collected pursuant to that warrant will not be suppressed, and Defendant's Motions are denied.[5]

## V. CONCLUSION

Although the Government conceded it will not use any of Mekosch's statements obtained at the scene of the traffic stop—and that information is excluded—Mekosch waived her rights prior to her interview with Detective Hulet and any statements made thereafter will not be suppressed.

Neither ping warrant was based on stale, uncorroborated information. The extension of Torres's ping warrant and the initiation of Mekosch's ping warrant were based on suspected criminal activity. Finally, the ping warrants were properly executed.

///

///

///

///

///

---

[5] Defendants make a final, passing argument that the warrants were overbroad in general. For the reasons outlined above, the Court finds the warrants were not overboard. Each outlined the information sought, why the information was necessary, and was limited in nature—albeit not in terms of time, but in scope.

## VI. ORDER

1. Mekosch's Motion to Suppress (Dkt. 78) is GRANTED in PART and DENIED in PART as explained above.

2. Torres's Motion to Suppress (Dkt. 79) and Mekosch's Joinder (Dkt. 98) are DENIED.

DATED: January 9, 2026

_____
David C. Nye
U.S. District Court Judge